IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WYATT BUSBY,                          §
                                      §
        Plaintiff,                    §
                                      §
v.                                    §        CIVIL ACTION NO. H-15-2929
                                      §
CAROLYN W. COLVIN,                    §
ACTING COMMISSIONER OF THE            §
SOCIAL SECURITY ADMINISTRATION,       §
                                      §
        Defendant.                    §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 19) and Defendant's Cross-Motion for Summary Judgment (Doc. 15). The court has considered the motions, Defendant's response to Plaintiff's motion, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for disability insurance benefits and supplemental security income

---

[1]  This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 9, Ord. Dated May 11, 2016.

under Titles II and XVI of the Social Security Act ("the Act").

A.  **Medical History**

Plaintiff was born on March 8, 1958, and was fifty-three years old at the alleged disability onset date of July 1, 2012.[2] Plaintiff earned a certificate of high school equivalency.[3]  In Plaintiff's most recent position, he delivered caskets to funeral homes until he stopped working in August 2012.[4]

Prior to the alleged disability onset, Plaintiff was admitted to Houston Northwest Medical Center on February 11, 2008, with hypertensive urgency, cellulitis, leg pain and swelling, and chest pain.[5]  At that time, Plaintiff reported that he did not have a primary care physician, had discontinued taking prescribed medication, and smoked a pack and a half of cigarettes on a daily basis.[6]  On June 16, 2009, Plaintiff was admitted to Houston Northwest Medical Center complaining of slurred speech, drooling, and weakness on the left side of his body.[7]  It was noted that Plaintiff had experienced a stroke and hypertensive urgency.[8]

---

[2]    See Transcript of the Administrative Proceedings ("Tr.") 27.

[3]    See Tr. 28.

[4]    See Tr. 28, 196.

[5]    See Tr. 414-27.

[6]    See Tr. 419.

[7]    See Tr. 385-89.

[8]    See id.

2

In November 2012, Hanna J. Abu-Nassar, M.D., ("Dr. Abu-Nassar") performed a physical consultative examination.[9] Plaintiff recounted his medical and social history without providing past medical records, and Dr. Abu-Nassar evaluated Plaintiff's physical abilities.[10] Dr. Abu-Nassar noted that Plaintiff had smoked a pack of cigarettes a day for forty years.[11] Plaintiff reported that he did not perform household chores or shop, and that he was able to sleep and watch television without issues.[12]

Dr. Abu-Nassar noted that Plaintiff's gait and range of motion were normal, and found that he could bend, walk for a half a block, stand for ten minutes, sit for twenty minutes, lift twenty pounds to arm level, and lift five pounds over his head, but he could not squat or climb more then ten steps.[13] Plaintiff reported that he had used a cane for four months.[14]   In evaluating Plaintiff's physical abilities, Dr. Abu-Nassar found that he could write, hold a coffee cup, broom, and skillet, and open a jar.[15] Plaintiff's eye exam revealed that he had 20/20 corrected vision in both eyes.[16]

---

[9]     See Tr. 264-67.

[10]    See Tr. 264-69.

[11]    See id.

[12]    See Tr. 265.

[13]    See Tr. 264-65, 268.

[14]    See Tr. 265.

[15]    See id.

[16]    See id.

Plaintiff reported that he had good night and peripheral vision and that he used reading glasses.[17]  Dr. Abu-Nassar diagnosed Plaintiff with hypertension and noted that Plaintiff complained of weakness on his left side and cerebral thrombosis.[18]

A month later, Plaintiff was admitted to Methodist Willowbrook Hospital with pain in his left side and high blood pressure.[19] Plaintiff reported that his symptoms began two months prior, and he experienced increased pain in his left side and behind his left ear the week before he was admitted.[20]  Plaintiff was diagnosed with a stroke and was given medication to treat his accelerated hypertension.[21]   It was noted that Plaintiff had bilateral hemianopia (vision loss after a stroke) and slight drift in his left arm and left leg.[22]

On January 8, 2013, Plaintiff presented at Houston Northwest Medical Center after he experienced high blood pressure.[23] Plaintiff's blood pressure was brought under control, and, upon discharge, it was noted that Plaintiff's chronic hypertension issues had been resolved and that he had been noncompliant with his

---

[17]    See id.

[18]    See Tr. 266.

[19]    See Tr. 272.

[20]    See Tr. 273.

[21]    See Tr. 272.

[22]    See Tr. 276.

[23]    See Tr. 378-83.

medications.[24]

On August 5, 2013, Plaintiff visited the Aldine Health Center where he was seen by Monica A. Wu, M.D., ("Dr. Wu").[25] Plaintiff told Dr. Wu that he had experienced strokes in December 2012, February 2013, and March 2013, but he did not have any remaining problems from these strokes other than pain in his left side.[26] Plaintiff complained that the pain medication was not working, he experienced swelling in his right leg, and he sometimes had high blood pressure levels and associated vision changes.[27] Plaintiff said he wore prescription eyeglasses, but had not seen an eye doctor in over a year.[28]

On September 13, 2013, Plaintiff returned to the Aldine Health Center.[29] Dr. Wu noted that Plaintiff admitted "to not being compliant with his medication" and that he "continue[d] to smoke cigarettes."[30] Dr. Wu described his blood pressure as "labile" and "poorly controlled."[31] Plaintiff's stroke, Dr. Wu noted, caused

---

[24] See Tr. 379. Earlier in the records of this visit to the hospital, it was noted that Plaintiff was compliant with his medication, but upon discharge, it was stated that he was noncompliant. See Tr. 379-80.

[25] See Tr. 310-33.

[26] See Tr. 330.

[27] See id.

[28] See id.

[29] See Tr. 361-77.

[30] Tr. 375-76.

[31] Id.

tingling and burning in his left hand, concentrated most in his middle three fingers.[32]  Dr. Wu devised a plan for treatment, instructing Plaintiff to stop smoking and change his lifestyle.[33]

Plaintiff visited the Aldine Health Center for another follow-up appointment on October 11, 2013, where he was treated by Ngoc Khanh Phan, D.O., ("Dr. Phan").[34]  Plaintiff reported that six days earlier, he had an episode where he experienced pain in his head and right arm and broke out in a sweat, but that he woke up the next day feeling better.[35]  Plaintiff complained of right shoulder pain that he said happened about once a month.[36]  Plaintiff explained that his blood pressure was high because he ran out of his medication, and Dr. Phan stressed the seriousness of taking his medications.[37]

**B.   Application to Social Security Administration**

Plaintiff applied for disability insurance benefits on January 10, 2013, claiming an inability to work since July 1, 2012, and applied for supplemental security insurance benefits on January 24,

---

[32]   See Tr. 375.

[33]   See id.

[34]   See Tr. 337-58.

[35]   See Tr. 350.

[36]   See id.

[37]   Tr. 354.

2013, claiming an inability to work since August 1, 2012.[38]   On a disability report dated January 15, 2013, Plaintiff claimed that two strokes, high blood pressure, neuropathy, chronic pain, and migraines limited his ability to work.[39]

On February 2, 2013, Plaintiff completed a function report.[40] Plaintiff said that he used reminders to help him remember to take his medication and to bathe, and that he had difficulty tying a necktie, bathing, and using the toilet.[41]   Plaintiff indicated that he did not prepare his own meals but estimated that it would take him approximately twenty minutes to make breakfast or lunch.[42]

Plaintiff was no longer able to work or to cut the grass, and he noted that he had trouble sleeping due to pain in his left arm, a residual effect from his most recent stroke.[43]   He also disclosed that he occasionally forgot to turn off the stove after cooking and did not complete household chores because he did not have the energy.[44]   Plaintiff only left his house when he was accompanied by

---

[38]   See Tr. 164-68.

[39]   See Tr. 184.

[40]   See Tr. 202.

[41]   See Tr. 203-04.

[42]   See id.

[43]   See Tr. 203.

[44]   See Tr. 204-05.

7

someone.[45]  He was able to drive a car.[46]  Plaintiff did not pay
bills, count change, or manage a savings account because he was no
longer employed.[47]  Plaintiff's hobbies included watching
television, which he did every day, and occasional window
shopping.[48] Plaintiff spent time with others on most days by going
to church or visiting and taking walks with friends, but he felt
that he was more isolated than before because of his physical
impairments.[49]

The list of activities that Plaintiff said were affected by
his conditions included lifting, squatting, bending, kneeling,
hearing, and stair climbing.[50]  Plaintiff did not provide detailed
information about how these activities were affected by his
conditions.[51]  Plaintiff reported being capable of walking for
approximately fifteen minutes before having to stop and rest and
needing twenty minutes of rest before continuing.[52]

Plaintiff estimated that he could concentrate for twenty
minutes at a time, follow written or spoken instructions, and

---

[45]    See Tr. 205.

[46]    See id.

[47]    See id.

[48]    See Tr. 205-06.

[49]    See Tr. 206.

[50]    See Tr. 207.

[51]    See id.

[52]    See id.

complete tasks.[53] He was able to get along with authority figures, but could not handle stress well; however, he indicated that he could handle changes in routine to a degree.[54] Plaintiff said that he used a walker, which was prescribed by his doctor in December 2012.[55] Plaintiff listed his medications and said that they caused tiredness and incontinence.[56]

On February 2, 2013, Plaintiff completed a work history report, in which he reported the following past employments: driving and preparing the deceased for a funeral home, from June 2000 to May 2011; working for Sino Source delivering caskets to funeral homes from April 2011 to August 2012; and cutting lawns.[57] Plaintiff completed another work history report on June 25, 2013, where he reported working for the funeral home from February 2000 to December 2008 and for Sino Source from March 2009 to September 2012.[58] Plaintiff filled out a third work history report on August 8, 2013, where he repeated some of his earlier work history, and added that he worked at Lamar Village Treatment Center as a staff care worker from 2008 to 2010; at Willie McDuffie Treatment Center

---

[53] See id.

[54] See Tr. 208.

[55] See id.

[56] See Tr. 209.

[57] See Tr. 196-99.

[58] See Tr. 226-33.

as a staff care worker from 2002 to 2006; and performed construction work for Grandy Management, Inc., from 1999 to 2001.[59]

On June 23, 2013, Plaintiff completed another function report.[60] Therein, he reported that he could not work due to numbness on his left side.[61] Plaintiff's daily routine consisted of walking, and he was no longer able to work or drive due to his conditions.[62] He continued to complain that his conditions affected his ability to sleep on his left side and dress himself.[63]

Plaintiff reiterated that he had difficulty handling money because he no longer was employed and that he watched television every day.[64] Plaintiff said that he did socialize with others and would go to church if he was reminded and someone accompanied him.[65]

The list of activities Plaintiff said were affected by his conditions included lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, and understanding.[66] In explanation of how his conditions affected the preceding

---

[59]   See Tr. 235-41.

[60]   See Tr. 220-25. It appears from the record that two pages with information about Plaintiff's daily activities are missing from the function report.

[61]   See Tr. 220.

[62]   See Tr. 221.

[63]   See id.

[64]   See Tr. 222.

[65]   See id.

[66]   See Tr. 223.

activities, Plaintiff stated that he could not lift more than five pounds, his ability to hear had declined, he could not bend over, and he got tired from walking.[67]   Plaintiff reported that he could walk about half a block before needing to stop and rest and that he required thirty minutes of rest before continuing.[68]   Plaintiff indicated that he used a prescribed walker daily.[69]

Dr. Arshad filled out a Stroke Residual Functional Capacity ("RFC") questionnaire on April 9, 2013.[70]   Dr. Arshad declined to indicate his length of treatment of Plaintiff.[71]   Dr. Arshad noted that Plaintiff had balance problems, weakness, unstable walking, and numbness or tingling.[72]   Dr. Arshad found that Plaintiff had significant and persistent disorganization of motor function in two extremities that disturbed his gait and station.[73]   Dr. Arshad also said that Plaintiff's impairments were consistent with his symptoms as described and that his symptoms would frequently interfere with his attention and concentration.[74]

---

[67]     See id.

[68]     See id.

[69]     See Tr. 224.  On the form, Plaintiff also checked that he used an artificial limb, but there is no medical evidence in the record that Plaintiff has an artificial limb.

[70]     See Tr. 300-06.

[71]     See Tr. 300.

[72]     See id.

[73]     See Tr. 301.

[74]     See id.

In evaluating Plaintiff's RFC, Dr. Arshad opined that Plaintiff's symptoms could be expected to last for more than twelve months.[75] Dr. Arshad estimated that Plaintiff could walk for less than a block without rest, sit for thirty minutes, and stand for five minutes.[76] Dr. Arshad concluded that Plaintiff could sit for less than two hours in an eight-hour work day and could stand or walk for less than two hours in an eight-hour work day.[77] If Plaintiff went back to work, he would need a job where he could change positions at will and take frequent, unscheduled, fifteen-to-twenty-minute breaks.[78] Dr. Arshad also noted that Plaintiff would need to use an cane or other assistive device to stand and/or walk.[79]

In terms of Plaintiff's lifting and moving abilities, Dr. Arshad reported that Plaintiff could never lift less than ten pounds, twist, stoop or bend, crouch, or climb ladders, and that he could rarely climb stairs.[80] He said that Plaintiff had significant limitations in reaching, handling or fingering.[81] In an eight-hour work day, Dr. Arshad indicated that Plaintiff could spend five

---

[75]   See id.

[76]   See Tr. 301-02.

[77]   See Tr. 302.

[78]   See id.

[79]   See Tr. 303.

[80]   See id.

[81]   See id.

percent of the time twisting objects with his hands, five percent
manipulating with his fingers, and five percent reaching overhead.[82]
Plaintiff, according to Dr. Arshad, should avoid concentrated
exposure to: extreme cold, extreme heat, high humidity, fumes,
odors, dusts, gases, perfumes, cigarette smoke, and solder fluxes;
and that Plaintiff should avoid even moderate exposure to solvents,
cleaners, and chemicals.[83]  Dr. Arshad concluded that Plaintiff was
incapable of even "low stress" jobs, but failed to provide the
reasons for his conclusion.[84]

Plaintiff completed disability reports on May 8, 2013, and
August 9, 2013.[85]  On May 8th, Plaintiff reported no changes in his
conditions.[86]  On August 9th, Plaintiff reported pain on the right
side of his body and difficulty walking.[87]

On July 1, 2013, Maryam Saif, M.D., ("Dr. Saif") completed a
Physical RFC Assessment.[88]  Dr. Saif addressed Plaintiff's physical
abilities, finding that he was capable of occasionally lifting or
carrying up to twenty pounds, frequently lifting or carrying ten
pounds, standing and/or walking for six hours in an eight-hour work

---

[82]    See Tr. 303-04.

[83]    See Tr. 305.

[84]    See id.

[85]    See Tr. 212-16, 244-48.

[86]    See Tr. 212.

[87]    See Tr. 244.

[88]    See Tr. 87-89, 97-99.

13

day, sitting for a total of about six hours in an eight-hour work day, and was not limited in pushing and/or pulling abilities.[89] Additionally, Dr. Saif found Plaintiff was able to frequently climb ramps or stairs, climb ladders, ropes, or scaffolding, balance, stoop, kneel, crouch, and crawl.[90]   According to Dr. Saif, the record did not establish any visual, manipulative, communicative, or environmental limitations.[91]

The Social Security Administration denied Plaintiff's application at the initial and reconsideration levels.[92]   Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[93]   The ALJ granted Plaintiff's request and conducted a hearing on February 7, 2014, in Houston, Texas.[94]

## C.  **Hearing**

At the hearing, Plaintiff and a vocational expert ("VE"), Susan Rapant ("Rapant" or "VE") testified.[95]   Plaintiff was represented by an attorney.[96]

---

[89]   See Tr. 87, 97.

[90]   See Tr. 88, 98.

[91]   See id.

[92]   See Tr. 61-74, 81-100.

[93]   See Tr. 128.

[94]   See Tr. 23-60.

[95]   See id.

[96]   See Tr. 25.

Plaintiff explained that he lived in an apartment with his sister and her grandchildren.[97]  The last time Plaintiff worked was in 2012 for a funeral home, where he helped to prepare the deceased for six to seven hours a week.[98]  Plaintiff said that he had never had full-time employment.[99]  Before working for the funeral home, Plaintiff worked for Sino-Source Centers, preparing caskets and delivering them to funeral homes.[100]  Before performing these jobs, Plaintiff worked for a limousine service and in construction.[101] Plaintiff also worked as a staff worker at the Willie McDuffie Treatment Center, and performed prior similar work at Lamar Village.[102]

Plaintiff explained that he stopped working in 2012 because he could no longer lift, load, and deliver the caskets by himself due to his health conditions.[103]  When asked what difficulties he would face if he went back to work, Plaintiff said that he would have trouble driving and lifting objects, and that the heaviest object he thought he could lift was a small chair.[104]

---

[97]    See Tr. 27-28.

[98]    See Tr. 28-29.

[99]    See Tr. 29.

[100]   See id.

[101]   See Tr. 41-42.

[102]   See Tr. 48.

[103]   See Tr. 30-31.

[104]   See Tr. 38.

Plaintiff sought medical treatment when he was not able to work, and he was diagnosed with high blood pressure and weakness.[105] Plaintiff estimated that he could stay seated for around twenty to twenty-five minutes before needing to move around to improve his circulation.[106] Plaintiff testified that the farthest he could walk without a break was from the witness stand to the parking lot, which his attorney estimated was a distance of about one hundred and fifty feet.[107]

In terms of Plaintiff's daily activities, he said that he had difficulty with bathing, putting on belts, and bending due to pain and weakness in his left side, especially in his left hand.[108] Plaintiff said that he also had issues with his vision and he needed to visit the eye doctor for a new pair of glasses.[109] Plaintiff attributed these difficulties to his 2012 stroke.[110] Plaintiff's sister would clean, sweep, and shop.[111] Plaintiff said that he was instructed by he doctor to stop driving in 2012 or 2013, but he still maintained a driver's license.[112] Plaintiff left

---

[105]   See Tr. 31.

[106]   See id.

[107]   See Tr. 31-32.

[108]   See Tr. 32.

[109]   See Tr. 33.

[110]   See id.

[111]   See Tr. 33-34.

[112]   See Tr. 34.

his residence approximately once a week and was driven by another family member.[113]   Plaintiff also stated that he had difficulty sleeping due to pain on his left side.[114]

Plaintiff told the ALJ that he had three to four strokes from December 2012 to March 2013.[115]   The ALJ probed Plaintiff about inconsistencies between his testimony and the medical records, focusing on Plaintiff's admission to doctors that he had not consistently taken his medication, and medical record which indicated that Plaintiff did not have any lasting effects from the strokes, other than pain.[116]

Plaintiff admitted that he continued to smoke two to three cigarettes a day, which he said was a decrease from the past.[117] Plaintiff took his own his blood pressure readings before and after consuming his blood pressure medication.[118]   After his first stroke, Plaintiff used a cane given to him by his doctor.[119]   Plaintiff reported that he experienced pain due to ineffective pain medication and said that he had been scheduled to undergo magnetic

---

[113]   See Tr. 34-35.

[114]   See Tr. 35.

[115]   See Tr. 42.

[116]   See Tr. 43-45.

[117]   See Tr. 44.

[118]   See Tr. 45.

[119]   See Tr. 46.

resonance imaging ("MRI").[120]

At the conclusion of Plaintiff's testimony, Rapant discussed Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[121] Rapant stated that his past relevant work at the treatment centers fit within the Dictionary of Occupational Titles ("DOT") definition of a resident care aide, which Rapant considered a medium exertional level position.[122] Plaintiff's position for 3D Office Supply in 2003, where he drove a van and delivered office supplies, fit the DOT definition of a van driver, considered a medium exertional level position.[123] After the ALJ instructed Rapant to only consider the van driver and resident care aide as Plaintiff's past relevant work, Rapant testified that Plaintiff would have transferable driving skills from his past work as a van driver to light exertional level positions.[124] The ALJ presented the following hypothetical individual:

> Hypothetically, would you consider for me, if we have someone of the same age, education, past work experience as the claimant, if this person could only work at a light exertional level, that is to say, they could occasionally lift and carry twenty pounds frequently down to ten, and they could stand and walk up to six hours,

---

[120]   See Tr. 35-37.

[121]   See Tr. 47-59.

[122]   See Tr. 49.

[123]   See Tr. 49-50.

[124]   See Tr. 50-56.

normal work day, with normal breaks, and again sit for up
to six hours.  This person can only occasionally climb
ladders, ropes, or scaffolding, but frequently could
climb ramps or stairs, and would be limited to frequent
balance, stoop, bend, kneel, crawl, crouch.[125]

The VE stated that such an individual could not perform any of
Plaintiff's past relevant work but would be able to perform
positions such as a car rental deliverer, outside deliverer, or
chauffeur.[126]

## D.   Commissioner's Decision

On February 28, 2014, the ALJ issued an unfavorable
decision.[127]  The ALJ found that Plaintiff met the requirements of
insured status from July 1, 2012, through the date of the decision,
and that Plaintiff had not engaged in substantial gainful activity
from since July 1, 2012, the alleged onset date.[128]  The ALJ
recognized the following impairments as severe: "status post
multiple cerebrovascular accidents and hypertension."[129]

Plaintiff's severe impairments, individually or collectively,
did not meet or medically equal disorders described in the listings

---

[125]   See Tr. 56-57.

[126]   See Tr. 57-58.

[127]   See Tr. 7-22.

[128]   See Tr. 10, 12.

[129]   Tr. 12.

of the regulations[130] (the "Listings"), according to the ALJ.[131]   In particular, the ALJ considered the preamble to Listing 4.00H(1) (cardiovascular system) in connection to Plaintiff's hypertension and Listing 11.04 (vascular insult to the brain).[132]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms and his medical treatment and stated that he followed the regulatory requirements as to both.[133]   When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms.[134] Second, he evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] functioning," making a credibility finding for those symptoms that were not substantiated by objective medical evidence.[135]

The ALJ discussed Plaintiff's medical treatment, including records from: the December 11, 2012 hospital visit for Plaintiff's stroke; the January 8, 2013 hospital visit for high blood pressure

---

[130]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[131]    See Tr. 13.

[132]    See id.

[133]    See id.

[134]    See Tr. 14.

[135]    Id.

experienced as a result of not taking medications; and physician visits in late 2013 for blood pressure management.[136]  The ALJ also reviewed Plaintiff's consultative physical examination by Dr. Abu-Nassar from November 13, 2012, and Dr. Arshad's medical source statement.[137]

The ALJ explained that he accorded the opinion of Dr. Arshad little weight because the length of time he had treated Plaintiff was unclear, and the disability opinion was conclusory and unsupported by the record evidence.[138]  The State Disability Determination Services opinions were given some weight even though they were completed by Dr. Saif, a non-examining physician, due to her familiarity with the regulations and review of disability claims.[139]

The ALJ engaged in a thorough account of Plaintiff's statements regarding the symptoms that he experienced as a result of his impairments.[140]  Specifically, the ALJ discussed the symptoms associated with Plaintiff's hypertension and strokes.[141]  He also addressed the lingering symptoms that Plaintiff attributed to his

---

[136]   <u>See</u> Tr. 15.

[137]   <u>See</u> Tr. 14-15.

[138]   <u>See</u> Tr. 15.

[139]   <u>See</u> Tr. 16.

[140]   <u>See</u> Tr. 14-16.

[141]   <u>See</u> Tr. 14-15.

strokes including "dizziness, weakness, and poor vision," as well as Plaintiff's representations regarding his RFC.[142]

He concluded: "After careful consideration of the evidence undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[143] In support of this conclusion, the ALJ discussed the fact that Plaintiff continued to smoke cigarettes and was noncompliant in taking his blood pressure medication, finding that these activities were "not what one would expect for a totally disabled individual."[144]   The ALJ found that Plaintiff's characterizations of his symptoms and limitations provided in the record were "inconsistent and unpersuasive."[145]

The ALJ found Plaintiff capable of performing work at the light level of exertion because he could lift and/or carry ten pounds frequently and twenty pounds occasionally, stand and/or walk six hours out of an eight-hour work day, and sit for six hours out

---

[142]    Tr. 15.

[143]    Tr. 16.

[144]    Tr. 15.

[145]    Id.

of an eight-hour work day.[146]   The ALJ included the following
limitations in Plaintiff's RFC: (1) occasional climbing of ropes,
ladders, and scaffolding; (2) frequent climbing of ramps and
stairs; and (3) frequent balancing, stooping, bending over,
kneeling, crawling, and crouching.[147]

The ALJ found Plaintiff unable to perform his past relevant
work as a resident care aide and van driver, which were considered
medium, semiskilled jobs.[148]   The ALJ noted that, if Plaintiff had
been able to perform a full range of light work, the Medical-
Vocational Guidelines[149] directed a finding of not disabled.[150]   The
ALJ's RFC assessment did not find Plaintiff capable of a full range
of light work; thus, the ALJ explained, he relied on the testimony
of the VE to determine whether Plaintiff could perform other
work.[151]   The ALJ noted that Plaintiff was approaching advanced age
and that he had a high school education, could communicate in
English, and had acquired driving skills from his past relevant
work.[152]   Based on the VE's response to the ALJ's hypothetical
question asking whether a person with Plaintiff's age, education,

---

[146]   See Tr. 13.

[147]   See id.

[148]   See Tr. 16.

[149]   20 C.F.R. Pt. 404, Subpt. P, App. 2.

[150]   See Tr. 17.

[151]   See Tr. 16.

[152]   See id.

work experience, and RFC could perform work available in the state and national economy, the ALJ found Plaintiff capable of performing the requirements of occupations such as car rental deliverer, outside deliverer, and chauffeur.[153]   The ALJ concluded that Plaintiff had not been under a disability from July 1, 2012, through February 28, 2014, the date of the ALJ's decision.[154]

Plaintiff appealed the ALJ's decision, and, on July 6, 2015, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[155]   After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by the court.[156]

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.   Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.   Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of

---

[153]     See Tr. 17.

[154]     See Tr. 17-18.

[155]     See Tr. 1-3.

[156]     See id.; Doc. 1, Pl.'s Comp.

24

the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).

Under the applicable legal standard, a claimant is disabled if she

is unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment. . .

which has lasted or can be expected to last for a continuous period

of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see

also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The

existence of such a disabling impairment must be demonstrated by

"medically acceptable clinical and laboratory diagnostic" findings.

42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702

F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any

"substantial gainful activity," the regulations provide that

disability claims should be evaluated according to the following

sequential five-step process:

> (1) a claimant who is working, engaging in a substantial
> gainful activity, will not be found to be disabled no
> matter what the medical findings are; (2) a claimant will
> not be found to be disabled unless he has a "severe
> impairment;" (3) a claimant whose impairment meets or is
> equivalent to [a Listing] will be considered disabled
> without the need to consider vocational factors; (4) a
> claimant who is capable of performing work that he has
> done in the past must be found "not disabled;" and (5) if
> the claimant is unable to perform his previous work as a
> result of his impairment, then factors such as his age,
> education, past work experience, and [RFC] must be
> considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20

C.F.R. § 416.920.  The analysis stops at any point in the process

upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B. Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

26

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision contains the following errors: (1) Plaintiff's subjective complaints were not properly considered by the ALJ; and (2) the ALJ did not properly weigh the medical evidence, making the RFC finding unsupported by substantial evidence. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

## A.   **Plaintiff's Subjective Complaints**

Plaintiff challenges the evaluation of his subjective complaints of pain, muscle weakness and vision changes on separate grounds, first arguing that Social Security Ruling ("SSR") SSR 16-3p, 2016 WL 1237954 (Mar. 4, 2016) should apply retroactively, and next arguing that the ALJ should have applied SSR 82-59, 1982 WL 31384, at *1 (Jan. 1, 1982) in this case.

### 1.   **Credibility Determination**

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's credibility because SSR that he applied has since been superseded by SSR 16-3p, which applies retroactively. Plaintiff additionally argues that the ALJ rests his credibility determination on the fact that Plaintiff smoked and was sometimes noncompliant with taking his medications.

SSR 96-7p, 1996 WL 374186, at *7-8 (July 2, 1996) was superseded by SSR 16-3p in March 2016, with the stated purpose of

"provid[ing] guidance about how [the SSA] evaluates statements regarding the intensity, persistence, and limiting effect of symptoms in disability claims under Titles II and XVI of the SSA." SSR 16-3p, 2016 WL 1119029, at *1.  SSR 16-3p eliminated the term "credibility" from the policy.  SSR 16-3p, 2016 WL 1119029, at *1; see also Mayberry v. Colvin, No. G-15-330, 2016 WL 7686850, at *5 (S.D. Tex. Nov. 28, 2016)(unpublished).

District courts are divided on the issue of whether SSR 16-3p should apply retroactively.  Mayberry, 2016 WL 7686850, at *5 (collecting cases).  However, this court agrees with Mayberry that the new regulation is similar in meaning to SSR 96-7p, finding that it "was designed to clarify rather than change existing law."  Id. As explained in SSR 16-3p, the new policy cautions "that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2016 WL 1119029, at *1.

Here, no matter which SSR applies, the court finds that the ALJ's assessment of Plaintiff's subjective complaints did not attack Plaintiff's character.  In evaluating Plaintiff's subjective complaints, the ALJ discussed the record evidence, including Plaintiff's medical history and his statements at the hearing. Plaintiff takes issue with the fact that the ALJ discussed Plaintiff's noncompliance with his medication and continued smoking.  This was not an attack on Plaintiff's character, but was evidence that Plaintiff's subjective complaints of physical

impairment did not comport with his symptoms.

An ALJ has discretion to use a plaintiff's noncompliance with treatment in making a determination about Plaintiff's subjective complaints, as long as the ALJ's conclusions are supported by substantial medical evidence. Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991). An ALJ may "discount a claimant's subjective complaints based on his decision to not follow physicians' recommendations." Lavery v. Astrue, No. V-11-3, 2012 WL 3276711 (S.D. Tex. Aug. 8, 2012)(unpublished)(citing Griego, 940 F.2d at 945). Under both SSR 96-7p and SSR 16-3p, the failure to follow prescribed treatment may be used in deciding whether Plaintiff's subjective complaints comport with Plaintiff's symptoms. See SSR 96-7p, 1996 WL 374186, at *7-8; SSR 16-3p, 2016 WL 1119029, at *8-9; Bradshaw v. Astrue, No. 1:07-CV-0150-C ECF, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008)(unpublished)(citing SSR 96-7p and Villa v. Bowen, 894 F.2d 1019, 1025 (5th Cir. 1990) and stating that "[c]learly, a claimant's failure to follow a prescribed treatment may be considered in making a credibility determination."). Both SSR 96-7p and SSR 16-3p require the ALJ to consider reasons why a claimant failed to comply with treatment, such as inability to pay for medication, hindering side effects, or a mental impairment. See SSR 96-7p, 1996 WL 374186, at *7-8; SSR 16-3p, 2016 WL 1119029, at *8-9.

Here, the ALJ's conclusions were supported by substantial

evidence in the record.  The ALJ discounted Plaintiff's subjective complaints about his impairments because of Plaintiff's failure to fully comply with taking his medication and to cease smoking.  The ALJ considered Plaintiff's statement on October 13, 2013, that he failed to fill his prescription for blood pressure medication. Notably, Plaintiff never provided the ALJ with an explanation why he was not in compliance with taking his medication in September or January 2013 or why he failed to stop smoking, despite his doctor's advice. The court finds that the ALJ did not err by considering these factors along with the medical evidence provided in this case.

**2.   SSR 82-59**

Plaintiff additionally contends that SSR 82-59 is applicable in this case, and the ALJ erred by not following its guidelines.

SSR 82-59 "state[s] the policy and describe[s] the criteria necessary for a finding of failure to follow prescribed treatment when evaluating disability under Titles II and XVI."  SSR 82-59, 1982 WL 31384, at *1.  Under this policy, "[a]n individual who would otherwise be found under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the SSA determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability."  SSR 82-59, 1982 WL 31384, at *1. This issue of failure to follow a prescribed treatment only comes

into play when the following four conditions are in place:

> 1.   The evidence establishes that the individual's
> impairment engaging in any substantial gainful activity
> (SGA) or, in the case of a disabled widow(er) that the
> impairment meets or equals the Listing of Impairments in
> Appendix 1 of Regulations No. 4, Subpart P; and
>
> 2.   The impairment has lasted or is expected to last for
> twelve continuous months from onset of disability or is
> expected to result in death; and
>
> 3.   Treatment which is clearly expected to restore
> capacity to engage in any SGA (or gainful activity, as
> appropriate) has been prescribed by a treating source;
> and
>
> 4.   The evidence of record discloses that there has been
> refusal to follow prescribed treatment.  SSR 82-59, 1982
> WL 31384, at *1.

Therefore, for SSR 82-59 to apply, "the evidence must first establish 'that the individual's impairment precludes [that individual from] engaging in any substantial gainful activity.'" Fall v. Astrue, No. H-12-0265, 2012 WL 6026438, at *10 (S.D. Tex. Dec. 4, 2012)(unpublished)(citations omitted).  If the ALJ bases the RFC or ultimate finding of disability on a claimant's noncompliance with treatment, whether explicitly or implicitly, then the ALJ must follow SSR 82-59.  Fall, 2012 WL 6026438 at *10 (citing Lindsey v. Astrue, No. 3:09-CV-1649, 2011 WL 817173, at *8 (N.D. Tex. Mar. 9, 2011)(unpublished)("the ALJ relied almost exclusively on substance abuse and noncompliance with prescribed treatment to determine Plaintiff's RFC, which provided the basis for the decision that Plaintiff was not disabled.").

However, if a plaintiff's noncompliance with treatment was

considered by the ALJ for the purposes of determining the plaintiff's credibility and severity of the plaintiff's symptoms, then "SSR 82-59 need not be mentioned or followed." Fall, 202 WL 6026438, at *10 (citing Hawkins v. Astrue, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *3 (N.D. Tex. Mar. 25, 2011)(unpublished)("Because the ALJ considered plaintiff's failure to take prescribed medications only in assessing her credibility, and not in determining whether she would be able to work had she followed her medication regime, the judge was not required to follow the procedures set forth in 20 C.F.R. § 416.930 and SSR 82-59."); Seibert v. Astrue, No. 4:09-CV-90-A, 2010 WL 6389303, at *10 (N.D. Tex. June 14, 2010)(unpublished)("The Court, after reviewing the ALJ's decision as a whole, concludes that the ALJ did not base his denial of benefits on Seibert's non-compliance with taking his medication but, instead, found that such non-compliance was one factor that undermined the credibility of Seibert and Prejean.").

Here, Plaintiff was noncompliant with his medications on multiple occasions and continued to smoke cigarettes even though he was told to quit by Dr. Wu. The ALJ noted Plaintiff's noncompliance with his medication and continued smoking in his decision, and stated that these behaviors were "not what one would expect for a totally disabled individual," finding that the "description and limitations which the claimant has provided throughout the record ha[ve] generally been inconsistent and

32

unpersuasive."[157]   In his decision, the ALJ did not find that Plaintiff would not be disabled if he stopped smoking or took his medication.   The court finds that the ALJ utilized Plaintiff's noncompliance with treatment to assess his subjective complaints and claimed limitations, and, therefore, SSR 82-59 is inapplicable in this case.

## B.   RFC Finding

In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).   The regulations provide that, although the opinion of a treating physician regarding a claimant's RFC must be considered, the ultimate responsibility for determining this issue lies with the ALJ.   20 C.F.R. § 404.1527(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).

The ALJ may properly rely on the testimony of a VE in determining restrictions on capability to work if the hypothetical question presented to the VE incorporates reasonably all disabilities recognized by the ALJ, and the claimant is afforded the opportunity to correct deficiencies in the ALJ's question. Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001); Bowling, 36

---

[157]   Tr. 15.

F.3d at 436.  The hypothetical question must take "into account all the restrictions reasonably warranted by the evidence."  Dominque v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004).  If the hypothetical question meets the above criteria, then the ALJ may justifiably rely on the VE's testimony in deciding job availability for a person with the plaintiff's limitations.  Masterson v. Barnhart, 309 F.3d 267, 273-74 (5th Cir. 2002).

**1.  Visual Impairment**

Plaintiff contends that the ALJ should have found Plaintiff's vision impairment to be severe and that the ALJ failed to properly incorporate Plaintiff's vision impairment into Plaintiff's RFC because the ALJ agreed with the VE that he had transferable driving skills.   Plaintiff also argues that the ALJ's finding that Plaintiff's visual impairment had only a minimal effect on Plaintiff "preclude[d] a finding that the impairment is not severe."[158]

In determining the severity of Plaintiff's impairments, the ALJ cited the standard set forth in Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985).  In his motion for summary judgment, Plaintiff agrees that the standard set forth in Stone is the correct standard for determining severity in the Fifth Circuit.  In accordance with this standard the ALJ found that Plaintiff's visual impairment "has only a minimal effect on the [Plaintiff's] ability to perform work-

---

[158]    Pl.'s Mot. for Summ. J. p. 13.

related activities."[159]   Plaintiff's argument that this language shall be interpreted to mean that his visual impairment had some effect on Plaintiff's work-related activities is unavailing, as the ALJ followed the correct standard set forth in Stone and found that the visual impairment would have only a minimal effect. Accordingly, the ALJ applied the correct standard in finding that Plaintiff's vision was a non-severe impairment.

The ALJ's finding that Plaintiff's vision was non-severe is supported by substantial evidence.  Here, Plaintiff complained to Dr. Wu of his worsening vision and his desire to see an eye doctor on August 5, 2013, and at the February 2014 ALJ hearing, but took no action to be evaluated by an eye doctor.  It also appears that Plaintiff complained of blurred vision when he was admitted to the emergency room for his strokes but took no followup action. Plaintiff's testimony that his doctor told him to stop driving is not reflected in the medical record.

There is no evidence supporting a worsening in Plaintiff's vision; in fact, in the function reports Plaintiff filled out in 2012 and 2013, he never indicated that he was having a problem with his vision.  In 2013, Plaintiff told Dr. Wu that he did not have any residual problems from the strokes other than pain. Additionally, Dr. Abu-Nassar's records showed that Plaintiff had 20/20 corrected vision in both eyes in November 2012; Dr. Saif

---

[159]    Tr. 13.

found that Plaintiff had no visual limitations in her RFC finding;
and Dr. Arshad made no indication in his medical source statement
that Plaintiff had vision issues.   Therefore, the ALJ's finding
that Plaintiff's vision was a non-severe impairment was supported
by substantial evidence.

In a related issue, Plaintiff argues that the ALJ did not
consider Plaintiff's vision issues in his RFC finding.   However,
the ALJ stated explicitly that he considered Plaintiff's visual
issues in his RFC finding, and included Plaintiff's statement as to
his vision problems in his summary of the hearing in his RFC
determination.   Therefore, the ALJ properly considered Plaintiff's
vision issues, which he found to be non-severe, in his RFC finding.

### 2.  Dr. Abu-Nassar's Opinion

Plaintiff argues that the ALJ erred by not disclosing the
weight that he gave to Dr. Abu-Nassar's opinion.   The court has
reviewed the ALJ's opinion, and finds that while the ALJ did not
explicitly state what weight he gave the opinion, he did give it
some weight.   For example, the ALJ incorporated Dr. Abu-Nassar's
assessment that Plaintiff could lift 20 pounds occasionally into
his RFC assessment.   However, regardless of the weight given to
this opinion, it would not change the outcome of the determination
that Plaintiff was not disabled because the ALJ's opinion is
supported by other substantial evidence in the record.

### 3.  Dr. Arshad's Opinion

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.   See 20 C.F.R. § 404.1527(c). Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."   20 C.F.R. § 404.1527(c)(2); see also Greenspan, 38 F.3d at 237 (stating that the Fifth Circuit has "long held that 'ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment[s], and responses should be accorded considerable weight in determining disability.'")(quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996)(stating that medical source opinions must be carefully considered, even on issues reserved to the Commissioner).

The ALJ is required to give good reasons for the weight given to a treating source's opinion.   20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

> When the determination or decision . . . is a denial[,] . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record[] and must be sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. § 404.1527(c)(2); see also Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); SSR 96-2p, 1996 WL 374188, at *1. When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following five factors: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; (5) the treating physician's area of specialization. 20 C.F.R. § 404.1527(c); Newton, 209 F.3d at 456.

Normally, a treating physician's opinion is given considerable weight when making a disability determination, "when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony." Myers, 238 F.3d at 621 (5th Cir. 2001). The Fifth Circuit has recognized the following exceptions as "good cause" for disregarding a treating physician's opinion: "statements that are brief and conclusory, not supported by

medically acceptable clinical laboratory diagnostic techniques, or otherwise supported by evidence." Id. An ALJ may "reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'" Scott, 770 F.2d at 485.

Plaintiff takes issue with the ALJ's consideration of Dr. Arshad's medical source statement, complaining that the ALJ only discounted its credibility because it was unclear how long Dr. Arshad had treated Plaintiff for his conditions. However, the ALJ explained his reasons for discounting Dr. Arshad's opinion, including the fact that the opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion" and that the opinion was "without substantial support from the other evidence of record."[160] The Fifth Circuit has explicitly said these are proper reasons for discounting such an opinion. Myers, 238 F.3d at 621 (5th Cir. 2001).

The ALJ's discussion of Dr. Arshad's medical source statement complies with the requirement from the regulations, SSRs, and case law to evaluate every medical opinion in the record and decide what weight to give each. It also complies with the requirement to provide good cause for the weight given to a treating source's opinion. The ALJ is required to consider certain factors, such as

---

[160]   Tr. 15.

the length of the treatment relationship, in deciding what weight to give to a medical source opinion; however, the ALJ is not required to record in writing every step of his thought process. 20 C.F.R. 404.1527(c)("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion."); Nguyen v. Colvin, No. 4:13-CV-2957, 2015 WL 222328, at *10 (S.D. Tex. Jan. 14, 2015)("[W]here there is reliable medical evidence from a treating or examining physician that controverts the claimant's physician, the detailed inquiry of each factor . . . is unnecessary.")(citing Rollins v. Astrue, 464 F. App'x 353, 358 (5th Cir 2012)); Sollien v. Colvin, No. 3:13-CV-970-O, 2014 WL 1012515, at *5 (N.D. Tex. Mar. 14, 2014)(unpublished)("The ALJ need not recite each factor as a litany in every case."). Nevertheless, the ALJ's decision here noted how the length of treatment was unclear and its inconsistency with the rest of the record. Additionally, there was an opinion from an examining physician, Dr. Abu-Nassar, that contradicted the physical limitations laid out in Dr. Arehad's opinion. Therefore, the court finds that the ALJ's decision not to give controlling weight to Dr. Arshad's opinion is supported by substantial evidence.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

40

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 10th day of February, 2017.

_____
U.S. MAGISTRATE JUDGE